STATE OF CONNECTICUT *v.* DENNIS B. VENNARD

ALCORN, HOUSE, THIM, RYAN and SHAPIRO, Js.

 

Argued April 8—decided May 19, 1970

*Wesley C. Gryk,* special public defender, for the appellant (defendant).

*George D. Stoughton,* chief assistant state's attorney, with whom, on the brief, was *John D. LaBelle,* state's attorney, for the appellee (state).

Thim, J. On June 9, 1966, at approximately 6:30 p.m., Primo Amadeo, a member of the Manchester police department, dispatched Officers Richard Rand and James Martin to 184 Hollister Street for the purpose of investigating a report received at police headquarters that a woman had been injured. Rand arrived at the scene first and saw the defendant in the center of the highway. Rand stopped his vehicle and asked the defendant the whereabouts of the injured person. The defendant responded by saying: "It's my mother on the couch in the house." Rand and the defendant entered the house, followed by Officer Martin less than a minute later, and found the defendant's mother, Mae M. Vennard, on a couch in the living room. She had a large bruise on the right side of her head and appeared unconscious. She was bleeding from the bruise, and the blood was coagulated on the side of her neck. Rand asked the defendant how his mother got hurt, and the defendant responded: "I hit her with a hammer". The defendant was immediately taken to police headquarters. Mrs. Vennard died later that evening.

The defendant was presented in the Circuit Court on June 10, 1966, and charged with murder in the first degree. On June 12, 1966, a Superior Court bench warrant was served on the defendant charging him with murder in the first degree, and the Circuit Court charge was nolled. The defendant was indicted by a grand jury for murder in the first degree on August 11, 1966. He pleaded not guilty and elected a trial by jury, and a verdict of guilty of murder in the second degree was returned. The defendant has appealed from the judgment rendered on the verdict. With this limited background we go first to the claims of error in the proceedings before trial.

## I

The defendant moved to quash the bench warrant and appearance of the defendant before the grand jury in the Superior Court on the ground (1) that a motion for disclosure, production, inspection and examination filed by the defendant in the Circuit Court was never ruled upon by the Circuit Court nor complied with by the prosecutor of that court; (2) that the state's attorney failed to respond to a copy of the motion for disclosure when it was filed in the Superior Court; and (3) that the defendant was deprived of his right to have a probable cause hearing in the Circuit Court. The trial court denied the motion to quash. The defendant claims there was error in the ruling of the court. We disagree.

The defendant was not entitled to pursue his motion for discovery under the provisions of §§ 167–172 of the Practice Book in the Superior Court. These sections provide for disclosure, production and inspection of evidence in civil actions and are not adapted to proceedings in criminal cases and do not come within the provisions of § 468 of the Practice Book. Rather than attempting to proceed under civil discovery rules, the defendant should have addressed a motion for production to the discretion of the court, which was the standard procedure in this state, at least until the passage in 1967 of General Statutes § 54-86a. Even if such a motion for discovery had been properly filed in a criminal case and had in fact been denied by the court, such denial or failure to comply with the motion would not be a proper ground for granting a motion to quash.

The defendant's claim that he was denied a hearing in probable cause in violation of § 54-76a of the General Statutes cannot be sustained. There was

no violation of that statute. See *State* v. *Stallings,* 154 Conn. 272, 276–79, 224 A.2d 718, where we held that a nearly identical procedure had been the practice in this state for a great many years and served the desirable end of expediting the disposition of criminal cases to the mutual benefit of the defendant and the state.

The defendant has also attacked the validity of the grand jury proceedings by which he was indicted for first-degree murder. Recently, we had occasion to examine the grand jury procedure in this state, in *State* v. *Menillo,* 159 Conn. 264, 274, 268 A.2d 667. In that case, we reaffirmed that an accused has no right to the presence of counsel during the proceedings. See *State* v. *Stallings,* supra, 282–83. In view of the limited purpose of the grand jury as described in *State* v. *Menillo,* supra, and in view of the requirement of secrecy of its deliberations, we see no reason to permit a defendant to jeopardize that secrecy by recording in writing or otherwise what transpires merely for the purpose of making such an investigation a more effective tool for discovery. It was never designed for such a purpose.

There are also certain errors which the defendant claims were made in the charge to the grand jury. We know of no instance where, in the absence of some clear violation of a defendant's constitutional rights, a successful challenge to the validity of a grand jury charge has been pursued, and the defendant has cited no authority in support of his present contention.

## II

We shall now proceed to discuss the defendant's claims of error made during the trial. At the start of the trial, after the clerk called the roll, admin-

istered the usual jury oath and read the indictment to the jury, he concluded with these words: "If you find him guilty, you will say so and say no more; if you find him not guilty, you will say so and say no more; please attend to the evidence". The defendant objected to these words, claiming that the jury should have been told also that they might find the defendant not guilty on the ground of insanity. It is apparent that the defendant was not entitled to such a statement at this stage in the proceedings. No claim had yet been made by him which would overcome the presumption of sanity. Furthermore, during its charge to the jury the court made it quite clear that the charge was to be the sole guide as to the jury's duty and the law. The court gave ample instructions relating to the possible verdict of not guilty on the ground of insanity, and on at least two occasions in the charge listed the five possible verdicts: guilty of murder in the first degree; guilty of murder in the second degree; guilty of manslaughter; not guilty on the ground of insanity; and not guilty. Since we are unable to see how the clerk's statement could have misled the jury, especially in the light of the charge, this assignment of error is without merit.

The defendant has also assigned as error the refusal of the court to find certain material facts which he claimed to have proved. After carefully examining the material which the defendant would have added to the finding, we have concluded that the result which we reach in this appeal would not be affected even if the material were included. Consequently, even if we were to find that the court erred in refusing to make the additions to the finding which the defendant sought to have added, the refusal would have been harmless.

The defendant has addressed many assignments of error to the admission of certain evidence by the court, and to the exclusion of certain other evidence. We shall discuss each claim separately.

Officer Amadeo testified that while acting as dispatcher at police headquarters he received a call at 6:23 p.m., June 9, 1966, as follows: "This is Dennis Vennard, 184 Hollister Street", and the caller reported striking his mother on the head with a hammer and that he did not know why he had done so. Over objection that the statement was hearsay and that there was no way of proving that the defendant actually was the caller, the court admitted it for the purpose of showing that a complaint was made, and not as an admission of the defendant, and so cautioned the jury during the charge. The court also admitted over objection and for the same purpose a daily log report of the Manchester police department which contained a record of the call. The log and Officer Amadeo's testimony were not barred by the hearsay rule since they were not introduced to prove the truth of the statements contained therein. *State* v. *DeNegris,* 153 Conn. 5, 12, 212 A.2d 894; *State* v. *Tolisano,* 136 Conn. 210, 214, 70 A.2d 118. Still, we think that they should not have been admitted, because of the hazard that the jury might consider the call as an admission of the defendant despite the caution in the charge, and since the limited probative value of the wording of the call was outweighed by the effect that it would tend to have upon the jury. See *Thibodeau* v. *Connecticut Co.,* 139 Conn. 9, 14, 89 A.2d 223; 29 Am. Jur. 2d, Evidence, § 262. The trial court abused its discretion in admitting the substance of the call, especially since it would have been sufficient for Officer Amadeo merely to testify that a complaint

had been received. Nevertheless, even though the rulings were erroneous, it does not necessarily follow that there must be a new trial, since the defendant has the burden of showing that the rulings were probably harmful to him. *State* v. *DeMartin,* 153 Conn. 708, 710, 216 A.2d 204; *Shulman* v. *Shulman,* 150 Conn. 651, 662, 193 A.2d 525; *Casalo* v. *Claro,* 147 Conn. 625, 630, 165 A.2d 153. Assuming that the jury did erroneously treat the call as an admission, it would be merely cumulative, and no new trial is required because so many other admissions by the defendant of the same nature were properly admitted during the trial without objection. See *State* v. *Reid,* 146 Conn. 227, 232, 149 A.2d 698; *West Hartford* v. *Talcott,* 138 Conn. 82, 93, 82 A.2d 351.

The defendant claims that a copy of a death certificate pertaining to Mrs. Vennard, executed by Dr. Donald Hazen, the assistant medical examiner for the city of Hartford, should not have been admitted into evidence because it was based on hearsay. There is no merit to this claim. *Blados* v. *Blados,* 151 Conn. 391, 397, 198 A.2d 213; *Branford Trust Co.* v. *Prudential Ins. Co.,* 102 Conn. 481, 486–88, 129 A. 379. The court, however, should have specifically cautioned the jury, either at the time of the admission of the certificate as an exhibit, or during the charge, as to the weight to be given the conclusions and, further, that the jury must be careful not to permit the examiner's conclusions to take the place of their own. *Branford Trust Co.* v. *Prudential Ins. Co.,* supra, 488. But, as in the case of the call to Officer Amadeo, the certificate contained evidence which, taken together with all the other evidence, was either generally cumulative or, as in the case of the recorded times of assault and death, was not shown to be damaging, and thus the defend-

ant has failed to demonstrate probable harm to his case in the court's failure to give the requested warning. See *State* v. *DeMartin*, supra; *West Hartford* v. *Talcott*, supra.

The defendant's next objection is to the admission of certain testimony of Dr. Mildred Stanton, a psychologist. On direct examination, Dr. Stanton testified as to the mental condition of the defendant in 1953 when she had seen him in her capacity as an employee of the state board of education. On cross-examination by the state, the court permitted Dr. Stanton to testify, over the defendant's objection, that in her practice she had never examined a person who had been charged with a crime and that her department kept no records which would indicate that she had done so. One of the proper purposes of cross-examination of an expert is to test his qualifications and credibility, and the trial court has broad discretion in determining whether a given question satisfies this purpose. See, generally, *Floyd* v. *Fruit Industries, Inc.*, 144 Conn. 659, 666, 667, 136 A.2d 918; *Cervino* v. *Coratti*, 131 Conn. 518, 521, 522, 41 A.2d 95. Whether the witness had ever examined a patient charged with a crime was arguably relevant in determining the value of her testimony as to the defendant's mental condition and its possible relationship to violent or criminal acts, and we cannot say as a matter of law that the court abused its discretion in permitting the question.

The final assignment of error directed to the admission of testimony concerns a defendant's exhibit for identification, a steel-headed hammer belonging to the defendant's counsel. This assignment of error is closely related to one directed to the court's earlier failure to admit the same hammer as evidence, so the two will be discussed together.

Part of the evidence used against the defendant was a state's exhibit, a steel-headed hammer with a wooden handle found on the dining room table at 184 Hollister Street on the day of the murder. Human type O blood was found on the driving end of the hammer by Dr. Abraham Stolman, chief toxicologist at the state department of health. The blood type matched that of Mrs. Vennard, and the autopsy revealed that death was caused by blows from a blunt instrument such as a hammer. This evidence, together with the defendant's many admissions that he hit his mother with a hammer, seemed to indicate that the state's exhibit might be the murder weapon. The defendant claimed that, since the police did not notice any blood on the hammer when they searched the Vennard home for bloodstained objects on the day of the murder, he had a right to examine Dr. Stolman with regard to the color of dried blood and the ease of seeing it. He therefore attempted to introduce as a demonstration another hammer, one belonging to his counsel, for the purpose of determining the color of type O blood when dried on the head of it. The court, after it initially failed to admit the latter hammer as a full exhibit, vacated its ruling and admitted the hammer, at which time the defendant withdrew his offer and objected to the court's ruling, claiming that the exhibit was useless at that late date.

"[T]he admission of evidence of experiments, demonstrations, or tests . . . rests in the sound discretion of the trial court, in both criminal and civil proceedings, and this discretion will not be interfered with on appeal unless it is apparent that it has been abused. As a concomitant of this principle, the question of the similarity of conditions prevailing at the time of the experiment or test to those which

prevailed at the time of the occurrence in question is one that lies within the sound discretion of the trial court, to be decided in the light of all the surrounding facts and circumstances. Accordingly, permission to perform, or to give evidence of the results of, such an experiment or test cannot be demanded as a matter of right." 29 Am. Jur. 2d 909, Evidence, § 818. Where, as here, a court exercises its discretion in favor of admitting demonstrative evidence after a thorough consideration of its admissibility, the defendant cannot complain either of a previous denial of admission or of the fact that the exhibit's value might be lessened when he voluntarily withdraws his offer of the evidence. The defendant had no absolute right to admission of the hammer at any stage in the proceedings, and he has failed to sustain his burden of showing that the court abused its discretion with regard to any of its rulings relating to it.

Turning to the remainder of the defendant's assignments of error relating to the exclusion of evidence, we come next to the so-called coroner's slip. While Dr. Stolman, the toxicologist, was testifying as a defense witness, he identified the slip of paper in question as one sent by him to the coroner and returned with authorization for him to destroy a certain blood sample. The defense offered the slip as a full exhibit, but the court refused to admit it. The record fails to disclose with certainty the purpose of the offer, and for this reason we cannot say that the court abused its discretion in failing to admit the exhibit. See *Hlavati* v. *Board of Adjustment,* 142 Conn. 659, 668, 116 A.2d 504. Furthermore, accepting Dr. Stolman's description of the slip as correct for the purpose of this discussion, we are unable to discern its relevancy or materiality to the matters at issue.

The defendant assigns error in the court's re-

fusal to admit the motions for disclosure he made in the Circuit and Superior Courts, together with a transcript of the proceedings in the Circuit Court relating to his claimed right to a probable cause hearing. We have already ruled that these motions and the claim for a probable cause hearing have no basis in law, and even if they were valid we are unable to see how they would be relevant to the issues which had to be decided by the jury.

The defendant attempted to introduce as evidence, during Dr. Otto Wiedman's testimony, a letter received by Dr. Wiedman from Dr. Howard Boyd, now deceased. There was no question that the letter was hearsay, but the defendant claimed it to be admissible either under General Statutes §§ 52-174 and 52-180 or as a past recollection recorded. General Statutes § 52-174 is inapplicable because it deals solely with certain civil actions. Section 52-180, permitting the admission of business entries and photographic copies which meet the statutory test, also is inapplicable. That section requires (1) that the memorandum be made in the regular course of business; (2) that it was the regular course of business to make the memorandum; and (3) that it was made when the act, transaction or event occurred, or shortly thereafter. *Szela* v. *Johnson Motor Lines, Inc.,* 145 Conn. 714, 723, 146 A.2d 910. Since the letter in question was not a business record and was not kept as such, there was no evidence that it met the statutory test. As for the claim that the letter was admissible as a past recollection recorded, our rule requires that the recorder testify as to the correctness of the recollection. *Papas* v. *Aetna Ins. Co.,* 111 Conn. 415, 420, 150 A. 310; *Neff* v. *Neff,* 96 Conn. 273, 278, 114 A. 126. Since Dr. Boyd was unavailable as a witness, the letter was not admissible.

The defendant also sought to have portions of his cumulative elementary school file admitted. The portions consisted of certain spelling and other papers done by the defendant while a student. As such, they were not sought to be admitted as a business record but rather as actual evidence of his schoolwork. Since his schoolwork, of itself, was not directly relevant to the issue of his sanity, it was proper for the court to exclude the evidence. Further, the record indicates that insofar as the papers may have been relevant, with proper interpretation, to the defendant's mental performance in school, Miss Esther Granstrom, the principal of the defendant's elementary school, testified as to their meaning, even though the actual papers were not admitted into evidence.

Finally, the defendant claims that certain questions directed to Dr. Lawrence Sereda, his witness, and relating to the psychiatric term "minimal brain dysfunction" should have been permitted to be answered. The record reveals that the defendant was unable to show any connection between his hypothetical questions regarding minimal brain dysfunction and any pertinent facts in evidence. We have long held that hypothetical questions which are so lacking in essential facts as to be without value in the decision of the case may not be asked of experts, lest the questions elicit a speculative opinion which is intended or fairly likely to mislead the jury. *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 666, 136 A.2d 918; *Johnson* v. *Toscano,* 144 Conn. 582, 591, 136 A.2d 341.

The defendant next assigns as error the court's failure to charge as requested in some twenty-two respects. We have carefully reviewed each of the requests in the light of the charge as given and see

no need to discuss them separately. Generally speaking, error in a refusal to charge will occur only when the request is pertinent to the claims of proof and correct in law, and when the court has not fairly covered the particular point raised. *Crowder* v. *Zion Baptist Church, Inc.,* 143 Conn. 90, 100, 119 A.2d 736. Many of the defendant's requests, while not given literally, were adequately covered in the charge, so that the case was fairly presented to the jury. See *Williams* v. *Dubin,* 155 Conn. 700, 701, 236 A.2d 86; *Marcio* v. *Helm's Express, Inc.,* 154 Conn. 615, 621, 622, 228 A.2d 128; *Smith* v. *New Haven,* 144 Conn. 126, 130, 131, 127 A.2d 829. An equally large number of requests contained argumentative factual claims, assuming proof of disputed facts or facts having no support in evidence, and were properly refused. *Himmelstein* v. *General Electric Co.,* 144 Conn. 433, 435, 133 A.2d 617; *State* v. *Tomassi,* 137 Conn. 113, 126, 75 A.2d 67. Many requests which were otherwise defective also failed to conform to § 252 of the Practice Book, which requires that each request to charge shall contain only a single proposition of law clearly and concisely stated. Finally, a number of requests contained incorrect statements of the law and could not properly have been given. *Michaud* v. *Gagne,* 155 Conn. 406, 410, 232 A.2d 326; *Bernard* v. *Ribner,* 151 Conn. 670, 673, 201 A.2d 658.

The defendant also claims that the court erred in charging in certain respects. Of the three exceptions taken to the charge during the trial, we have already disposed of that dealing with the death certificate signed by Dr. Hazen by finding that the defendant failed to prove probable harm to his case.

The court's failure to refer to both a diseased and an abnormal mind at each and every occasion during which the defense of irresistible impulse was men-

tioned in the charge is likewise not shown to be harmful to the defendant. The record reveals that the court had sufficiently charged on the defense at least once, as follows, during the charge on insanity, and a further complete definition was unnecessary: "The impulse to do an otherwise criminal act which is recognized by courts as an excuse for a crime is an impulse produced by and growing out of some mental disease or abnormality affecting the volitive as distinguished from the perceptive powers, so that a person afflicted while able to understand the nature and consequences of his act and to perceive that it is wrong is unable because of such mental disease or abnormality to resist the impulse to do it." See *State* v. *Pastet,* 152 Conn. 81, 84, 203 A.2d 287.

The final exception taken during the trial was addressed to the charge on malice. The court's instruction that the law implies or infers malice from the circumstances of a killing when an unlawful homicide is shown to have been committed and where no circumstances of mitigation, extenuation or excuse appear was, especially when read together with the examples the court gave, a correct statement of the law. *State* v. *Miller,* 154 Conn. 622, 627, 228 A.2d 136; *State* v. *Jacowitz,* 128 Conn. 40, 44, 45, 20 A.2d 470; *State* v. *DiBattista,* 110 Conn. 549, 559, 148 A. 664; *State* v. *Feltovic,* 110 Conn. 303, 307, 147 A. 801. There is likewise no merit to the defendant's assertion that murder in the second degree rests only upon implied malice and not express malice. See *State* v. *Jacowitz,* supra, where we approved, as to the elements of second-degree murder, a charge which contained definitions of both express and implied malice.

The defendant also asks this court to reject the

court's charge as to the insanity defense, a charge which he recognized was proper under our law and was upheld as recently as 1968 in *State* v. *Conte,* 157 Conn. 209, 251 A.2d 81, cert. denied, 396 U.S. 964, 90 S. Ct. 439, 24 L. Ed. 2d 428. Although this claim was not raised at the trial, we have decided to consider it briefly because of the obvious importance of the insanity defense to this particular defendant, as revealed by the claims of proof. While we recognize that the legislature altered the test of insanity by § 54-82a of the General Statutes, that section would not affect the defendant's trial, since it became effective some five months after the verdict and judgment in this case. As in *State* v. *Davies,* 146 Conn. 137, 148 A.2d 251, cert. denied, 360 U.S. 921, 79 S. Ct. 1441, 3 L. Ed. 2d 1537, where we found no reason to adopt the test of insanity stated in *Durham* v. *United States,* 214 F.2d 862 (D.C. Cir.), we see no reason to apply the test established by § 54-82a retroactively to the defendant. He has failed to persuade us either that the new rule might have altered the verdict in his case or that the test of insanity which was properly given the jury and which we shall discuss at length in the next section of this opinion was unfair or unjust in its application to his circumstances.

Before the verdict was returned, the defendant moved that the charges against him be dismissed. He claimed that the denial of his motions for disclosure and for a probable cause hearing, together with the rejection of his claims regarding the alleged illegality of the grand jury procedure, amounted to a denial of due process. Each of these component claims has been dismissed as groundless elsewhere in this opinion, so the denial by the court of the defendant's motion to dismiss was proper.

## III

Turning now to those claims arising after the verdict, we come first to the error assigned in the denial of the defendant's motion to set aside the verdict. From the evidence presented, the jury could have found the following facts: On June 9, 1966, after receiving a complaint by telephone, two officers of the Manchester police department drove to the Vennard residence. The officers found Mrs. Vennard unconscious and bleeding from the side of her head. Dennis was at the scene and told the officers he had struck her with a hammer. Mrs. Vennard died at 10:05 that evening, and the autopsy revealed that death was due to brain injuries, apparently resulting from a blow from a blunt instrument shaped like a hammerhead. Dennis later told two psychiatrists who subsequently testified for the defense that he had arrived home from work at the usual time on June 9, 1966, and saw his mother asleep on the couch. He said that he went downstairs to the cellar and picked up a hammer and then returned upstairs and found himself holding the hammer and standing over his mother, after which his mind went blank until he later called the police. A hammer was found on the dining room table at the Vennard home and was delivered to the state laboratory for examination. Stains of human type O blood, the same type as Mrs. Vennard's blood, were found on the head of the hammer by a state toxicologist. From this evidence the jury could justifiably have found beyond a reasonable doubt that the defendant had perpetrated an unlawful homicide under circumstances supporting a verdict of guilty of murder in the second degree.

The defendant, however, introduced substantial

evidence that he was legally insane at the time of the murder, and he pursues this defense most vigorously on appeal to this court, claiming that no jury could reasonably have found him legally sane. Because substantial evidence tending to prove insanity came into the case, the state could no longer rely on the presumption that the defendant was sane, but had the burden of proving beyond a reasonable doubt that he was legally sane and responsible at the time the offense was committed. *State* v. *Conte,* supra, 212.

The common-law standard of insanity approved by this court and applicable to the defendant (but see General Statutes § 54-82a, effective June 13, 1967, for the current statutory test of insanity) requires that an accused, to be the subject of punishment, must have mind and capacity, reason and understanding enough to enable him to judge the nature, character and consequence of the act charged against him, that the act was wrong and criminal, and that the commission of it would justly and properly expose him to a penalty. *State* v. *Conte,* supra, 210, 211; *State* v. *Davies,* supra, 144. An individual, to be the subject of punishment, must further not have been overcome by an irresistible impulse arising from a diseased or abnormal mind. *State* v. *Pastet,* supra.

The defendant offered evidence, through two prominent psychiatrists, that he was suffering from schizophrenia, which had manifested itself in him in early childhood, and that the prognosis for him was poor. The psychiatrists concurred in an opinion that Dennis had a mental disease or abnormality which made it impossible for him to resist the impulse to strike his mother. Furthermore, one of the psychiatrists, Dr. Robert Doherty, testified that Dennis

could not have known the nature, quality or result of his act on June 9, 1966.

In addition to the testimony of the psychiatrists, the defendant offered a substantial amount of evidence from psychologists, social workers, teachers and school administrators, together with others who knew him, that he had been very disturbed and unpredictable since childhood and was often aggressive and uncontrollable, sometimes demonstrating psychotic symptoms.

Despite the quantity of the defendant's evidence tending to show insanity, the weight to be given the opinion evidence of expert witnesses, as is the case with other witnesses, is for the jury to determine. *State* v. *Kenyon,* 134 Conn. 43, 49, 54 A.2d 585. The jury could have disbelieved all or any portion of the defendant's evidence as to insanity. And although the state produced no expert testimony of its own to sustain the instant conviction, we have recently held that the state is under no requirement to do so, although it still has the burden of proving sanity once the presumption is overcome. *State* v. *Davis,* 158 Conn. 341, 356, 260 A.2d 587.

The jury thus were entitled to disbelieve the opinions of the defendant's experts and could reasonably have found the following: Dennis was less than truthful and candid in dealing with the psychiatrists who testified; on June 9, 1966, he was excited and concerned about getting aid for his mother, but otherwise normal when the police first came to the Vennard home to investigate the reported assault; he appeared calm and remorseful about his action while at police headquarters; he seemed normal the next day; Dennis' father thought his son's behavior was generally good around home and that it had seemed particularly good shortly before

the time of the assault; Dennis' closest friend had remembered Dennis to be "happy-go-lucky and laughing" at work on June 9, 1966, and otherwise normal and untroubled; others who knew Dennis personally did not seem to think that there was anything seriously wrong with him. In addition, there was some conflict among the defendant's experts as to the seriousness of Dennis' symptoms, the description of his mental condition, and whether he might be a danger to others. There was also evidence from his elementary school principal that he was bright, read well, and had a good vocabulary. The training supervisor where Dennis was employed thought he had good aptitude and could meet his employer's training standards. In summary, there was ample evidence from which the jury could justifiably have concluded beyond a reasonable doubt that the defendant was sane at the time of the assault upon his mother and that he was guilty of murder in the second degree.

In addition to the claim that the verdict was against the evidence and contrary to law, the defendant claimed as an alternative ground for his motion to set aside the verdict that the jury were biased. This latter allegation appears to be based upon his theory that if the state does not introduce expert testimony as to sanity, the jury are bound by law to accept the opinion of the defendant's experts, since the jury, as laymen, cannot reach a conclusion as to sanity. We have already indicated that our law is contrary to this position. Merely because the jury did not adopt as their own the view of the defendant's experts does not mean that they were biased, and the defendant has failed to sustain his claim. The motion to set aside the verdict was properly denied.

The defendant asks us to consider certain other claims which were not raised during the trial. Although we are not bound to do so, we shall briefly discuss each claim. The first is that the jury were invalidly constituted because persons were allegedly excluded who did not believe in capital punishment. This point need not be considered, since the defendant was not convicted of a capital crime and he is not under a sentence of death. See *Witherspoon* v. *Illinois*, 391 U.S. 510, 521, 522 n.21, 523, 88 S. Ct. 1770, 20 L. Ed. 2d 776.

Another such claim is that the statements made by the defendant to the psychiatrists who later testified as witnesses for the defense should have been privileged and inadmissible at trial. No objection was taken to the psychiatrists' testimony relating to what the defendant told them, however, so the defendant clearly waived any privilege he may have had. 58 Am. Jur., Witnesses, §§ 369, 371.

Finally, the defendant claims that certain testimony of Officer Martin, of the Manchester police department, as to a telephone conversation which Martin overheard at the police station between the defendant and his attorney, should not have been admitted. No objection to this testimony was made at trial, and, furthermore, even if the conversation would ordinarily be privileged, there is no evidence that the defendant sought to ensure the confidentiality of the conversation. See *State* v. *Hanna*, 150 Conn. 457, 466, 467, 191 A.2d 124; 58 Am. Jur., Witnesses, § 492. Additionally, "[i]t is generally held that when a privileged communication is overheard, whether by accident or design, by some person not a member of the privileged relation or a necessary intermediary, such person may testify as to the

communication. He is absolutely unaffected by the rule of privilege." 58 Am. Jur. 216, Witnesses, § 365.

There is no error.

In this opinion the other judges concurred.